Gould, J., (dissenting.)
The great mass of evidence before us; the large number of elaborate medical disquisitions which are not evidence, and the extended and profound arguments of counsel, would naturally create the impression that this case is one involving not merely intricate questions of law, but complicated matters of fact, depending on scientific principles, difficult of application, and that any satisfactory opinion upon it must include a particular analysis of all the voluminous papers. A very protracted and careful examination of all the evidence in the case, with reference as well to the medical essays as to the briefs, has satisfied me that but .two questions of fact, and as many questions of law, are really before us; although., some questions upon the rules of evidence, and the weight of evidence of different kinds, require consideration, in order to arrive at a proper decision on the facts.
We have before us, on appeal, the decision of the surrogate of the city and county of New York; which is stated by himself, to be: 1. That the original will (of Sept. 1842) is valid; neither altered or revoked, except so far as it may be so expressly, by the subsequent codicils; 2. That Henry Parish, by his attack (of paralysis) in July, 1849, was not permanently *67 deprived of testamentary capacity, though his faculties were enfeebled and impaired, and his power of mental manifestation was greatly affected. Having established these facts, he proceeds to say, (in the 3d place,) in cases of this kind it becomes necessary to satisfy the court, beyond the mere “ factum, ” of the instrument, that its provisions were the free expression of the will of the deceased. This (latter) position would seem to be a conclusion of law. If so, it must mean that, although Mr. Parish had testamentary capacity (as “.not being deprived of ” it), and executed a will in all respects according to the law; yet, that is not, in all cases, sufficient. Or, if the finding be not intended as a conclusion of law, it must mean that where testamentary capacity exists, and where the instrument proposed is shown to have been executed with all the legal requisites, by a person having such capacity, the court is bound to go further, and lopk in detail at the specific provisions of the will, and ascertain whether they are, in' fact, the free expression of the will of the deceased.
From this position (of law or fact), the surrogate arrived at the .determination, that the codicil of September, 1849, was well executed and valid; and that the two latter codicils (of Sept., 1853, and June, 1854), were not well executed, and were void. So that the will and the first codicil were admitted to probate, and the last two codicils were not.
The third ground so taken, if taken as a conclusion of law, would hardly seem correct; since the statute calls for no more than a disposing mind, and the specified formalities. And the true question for a court is, had the deceased capacity to make any will, not had he capacity to make such a will. The tenor of the will is to be considered only so far as it may tend to show a want of capacity, because the will itself is absurd, or inapplicable to the state of the property disposed, of, or the state of the testator’s family and relations. It may thus become legitimate evidence upon questions of fact relating to the capacity of the deceased, or relating to fraud practised, or undue influence exercised upon him. But the law is fully satisfied when its expressed requirements are fully complied with.
*68 For the present, reserving the secondary questions of fraud and undue influence, we are to consider the primary point of testamentary capacity. Where this does not exist, there is no mind to he influenced, either duly or unduly.
To decide advisedly, whether in fact Mr. Parish had testamentary capacity at the several dates named to us, it is requisite first, to define as accurately as may be, wherein testamentary capacity consists; and it is further necessary to state what evidence is legitimate upon that point of fact. In determining the standard of legal capacity to make a will, we are to bear in mind, that it is the universal maxim of the law, that almost any fixed rule (on any matter of legal action), is better than to leave the matter a subject of uncertain and changeable discretion. That, although it is hardly possible to establish a rule under which there will not occur “ hard cases,” yet intolerable mischief would attend the absence of a rule, which would be substantially the absence of law. Then, the judge, would determine in every case, and the decision would depend on his affections, his patience, his discretion; and nothing but confusion would arise in society. (1 ■ Ridgway’s Oases in Parliament, 551.)
In this country, where individual rights know no restraint which is not imposed as necessary to the general good, there is no policy of the law tending to prevent a man’s doing “what he will with his own.” And the statute of wills, enabling a man to. direct how his property shall go .after his death, is but supplementary to his absolute' control over it during his life. We acknowledge no right to it (as against his will), in any one, whether before or after his death. Our statute of descents takes effect- only when the owner of real estate dies “ without devising it ” (1 R. S., p. 751, § l); and that of distributions, only when a person “ dies intestate.” (2 R. S., p. 96, § 75.) And the statute of wills is to be construed beneficially and liberally towards the owner of property; to impose on him no restraint which the statute does not plainly impose, and to give to him the benefit of every possible intention of the act.
*69 The statute is (as to realty), “ all persons, except idiots, persons of unsound mind, married women,” &c., may devise, &c. (2 R. S., p. 56, § 1.) As to personalty, it is, “ every person of sound mind and memory ” may make a will. (2 R. S., p. 60, § 22.) As explanatory of the language of the act, we may cite the statute as to alienating lands (1 R. S., 719): every person capable of holding land, “ except idiots, persons of unsound mind and infants,” may alien the same. And prior to the Eevised Statutes, the statute of wills excepted “ idiots, lunatics, and persons of insane mind.” Now, “ unsound mind,” and the converse, “ of sound mind and memory,” as cited above, being used in reference to legal capacity for the execution of legal instruments, must, until the contrary intent clearly appear, bear the same construction in all the sections cited; and that must be the construction which the law has for centuries given them; they having become terms so well known to the law, as to have a fixed legal meaning.
Thus, Littleton (§ 405), as rendered by Coke, makes “ of non-sane memory,” “ non compos mentis,” and “ not of sound memory,” convertible terms. And Coke, in his note, adds, “ many times (as here it appeareth), the Latin word explaineth' the true sense, and calleth him not amens demens, &c., for non compos mentis is most sure and legal." And he proceeds to define one non compos mentis (aside from natural idiots, lunatics, and drunken men), as one that “ by sickness, grief, or other accident, wholly bseth his memory and understanding.” Lord Chancellor Hardwicke (Ex parte Bamsby, 3 Atk., 171,) says that insance mentis, non compos mentis, and of unsound mind, amount to the same thing, adding: “ and I shall desire that they still continue so, or else it will introduce great uncertainty and confusion, as these words have a determinate signification." (Pp. 172, 173.)
Now, upon this question of competency (independently of the element of fraud, or that of undue influence), there seems to be no great diversity in the decisions of our own courts. They proceed upon the ground, that a person non compos mentis cannot make any legal instrument (will or deed), however *70 simple the document may be. And, on the other hand, that one .who is compos mentis (no matter whether of strong or feeble intellect), may make any instrument, however complex it may be. Swinburne on Wills (part 2, § 4), says: though an idiot or natural fool should make a will (apparently) very wise, it would not be therefore valid. Does not the converse necessarily follow? no matter how (apparently) foolish or complicated the will, if the testator were compos mentis, it is not, therefore, void. That is to say, the nature of the will does not make the man either competent or incompetent. And so far as Dr. Lushington (Stutts v. Schaeffle, 16 Jur., 909), varies from this rule, in saying that a testator’s “ capacity must be considered with reference to the act done, whether he was equal to, and capable of, the act in question;” it will be found that the cases which he calls “ questions of capacity, proportionate to any given act,” are not merely the most difficult of all questions; but that they are, to human tribunals, impossible of solution, and they would inevitably come within the citation made above, and be decided according to “ the affections, the patience, and the discretion ” of each particular judge.
In Jackson v. King (4 Cow., 207), the question was that of the competency of the grantor of. a deed; and the ruling was, that the law recognized no incompetency but that of idiots, lunatics and persons non compos mentis; giving of the latter the description already cited from Ooke, Littleton. The decision further explains incapacity as applicable to “ not a partial, but an entire, loss of the understanding;” and holds that the common law has drawn no discriminating line, by which to determine how great must be the imbecility of mind to render a contract void, or how much intellect must remain to-uphold it. In 21 Wendell, 142, a deed was held valid because “no part of the evidence went far enough to show a total want of understanding.” In the case of Stewart v. Lispenard (26 Wend., 255), the ruling of the principle was fully in accordance with the- prior cases, that every person who is not an idiot, a lunatic, or a person non compos mentis, is competent to make a will. The application of this rule to the facts of that case it is not *71 appropriate for us here to consider. Nor need we inquire whether that case goes further than what we state as the rule. It is enough for our purpose that it should, as it certainly does, go as far as the prior cases. And it will hardly answer to cite, as the law of that case, the opinion of the Chancellor, which the decision reversed. In Blanchard v. Nestle (3 Denio, 3 7) the' whole length of the ruling in Stewart v. Lispenard was approved. And (in a- note to the same page) Osterhout v. Shoemaker holds a deed valid, on the ruling that “our law does not distinguish between different degrees of intelligence. ' It does not deny to a man of very feeble mind the right to make contracts and manage his own affairs. In the absence of fraud, proof of mere imbecility of mind in the grantor, however great it may be, will not avoid his deed ; there must be a total want of understanding.” The latest decision, that upon the will of Bichard Ustick, in this court (decided in*December, 1861, not yet published), adapts its forms of expression to the case, as there presented, but certainly does not profess to differ from the prior cases. In saying that Ustipk had a certain degree of capacity, which “ is all that is essential to legal competency in a testator,” it does not say that our established rule, as to legal competency, is not correct. And it considers a man competent, of whom it can be truly said, “I cannot say he was of unsound mind., but his mind was weakenedwhich accords with the line of prior decisions.
These decisions we are, in substance, asked to overrule (after a lapse of nearly forty years since the first one, Jackson v. King), and to hold that, although Mr. Parish was certainly compos mentis (this is the argument as to the law, as separated from the fact of total incompetency, which is claimed), yet the court must be satisfied, beyond the mere legal execution of the will, that its provisions are the free expression of his will, to hold that though having legal capacity, speaking by his will is not sufficient; the proponents must do something undefined, which the statute has not required.
Were it necessary, in this court, to go beyond the decisions of our own State, we should find among various cases, many *72 of which are of all shades of difference from ours, some which are substantially like ours. Thus, in 7 Sergeant & Rawle (Pa.), 90, as to making- a will, it is said “ there is no standard, by > which the understanding is to be weighed, but one; has the party such a portion of understanding as would enable him to do any binding actf ” In Krime v. Krime (9 Conn., 104), had he an understanding of the nature of the business he was engaged in; a recollection of the property he meant to dispose of, and of the persons to whom he meant to convey it ? In Harrison v. Rowan (3 Wash. C. C. R., 58), a testator’s capacity to dispose of his property by will may be perfect, and yet very inadequate to the management of other business; as to make contracts for the purchase or sale of property. It is not necessary that he should comprehend the will’s provisions, in their legal form. It is sufficient if he has such a mind and memory as will enable him to understand the elements 'of which it is composed; the disposition of his property in its simple forms. (See, also, 3 P. Williams, 129; 1 Ridgway’s Cases in Parliament, 532, &c.)
As to the burden of proof, it is claimed by the contestants, that the proponents shall, on their part, make out affirmatively that the deceased was of sound mind; and that, in a case where the positive testimony of witnesses produced is balanced, the will must be' declared invalid. The words of our statute (2 R. S., p. 58, § 14 [10])—“ if it shall appear upon the proof taken that such will was duly executed, that the testator, at the time of executing the same, was in all respects competent to devise real estate, and not under restraint,” the will shall be ordered proved, &c.,—have been deemed to countenance this doctrine. A first reading might leave this impression; but further consideration would probably show that no rule of evidence is affected by this statute; since, that the testator was not under restraint is, by this act, as much required to “ appear upon the proof taken,” as any other requisite to full competency and due execution. The proper construction of that statute would seem to be this: That if, upon the whole proofs, considered according to the rules of evidence governing legal tribunals, *73 such facts shall fairly appear, the will shall be established; for no one would doubt that if restraint were claimed as a ground for avoiding the will, that must be affirmatively proved by the contestants.
If this view of the statute be sound, we are left to the general rules of evidence, upon the question of insanity. And as to those rules, there can be little doubt that a man is, in law, a “ reasonable being,” until the contrary is proved. That sanity pertaining to his natural state, being one of-his essential and inherent attributes, the party who asserts that a freak of nature, or the accession of disease, has deprived him of that attribute, or changed that state, takes the affirmative of an issue of fact, with all the burdens of an affirmative. Insanity, or a diseased, unnatural mind, is not a mere negative of sanity. It is an actual, positive mental state, and admits of quite as direct and positive proof as could sanity. (47 Eng. Com. Law R., 134, 135; 1 Metcalf R., 500; 5 Johns. R., 159.)
In this State, we are not without direct authority on this point, and that, as concerning a will, and under a statute equiva lent to our present statute. Our old statute of wills (embodied and re-enacted, 1 R. S., p. 305, § 6) was, “if, upon the proofs, it shall appear that such will was duly executed, and that the testator at the time when, &c., was of full age and of sound mind and memory andnot under any restraint” the will should be recorded. Under that statute (which was enacted in 1801, see 1 Kent & Radcliffs Laws of N. Y., p. 178, § 6), the case of Jackson v. Van Duzen was decided, (5 John., 144.) At page 158 the opinion of the court, given by Van Ness, J., says: “In all cases where the act of a party is sought to be avoided, on the ground of his mental imbecility, the proof of the fact lies upon him who alleges it, and until the contrary appears, sanity is to he presumed, ” (citing a number of cases.) The precise point was there at issue, on the charge to the jury.
Jackson v. King (4 Cow., 207), though arising upon the question of competency to make a deed, contains (at p. 216), a full recognition of the soundness of Judge Van Ness’ ruling on this point. Phillips’ Evidence (Edwards’ ed. of 1859, vol. 3, *74 p. 605, chap. 18), says of the attempt to impeach the validity of a will, on account of an alleged incapacity of mind in the testator: “ The burden of proof rests upon the party attempting to invalidate what, on its face, purports to be a legal act.” (See, also, 1 Peters’ Cir. C. R., 163; 3 Wash. C. C. R., 582; 23 Penn., 275; 10 N. Hamp., 515; 2 Green’s Ch. R., 280.)
With such guides for our further progress we are prepared to examine the evidence upon the points, or facts, to be proved, ánd thereby to determine how far the claims of either party are established. A part of the printed matter submitted to us, and that a considerable one, in volume, will, however, be found not to require very minute examination.
The medical disquisitions of men, learned and eminent in that profession, are, no doubt, interesting as matters of general information, and even as the arguments of medical counsel. And they (including the reply of one of these counsel) are good' illustrations of the zeal and positiveness with which “ doctors disagree,” upon subjects of which all human knowledge is imperfect, and which will continue to be shrouded in mystery until we “see face to face, and know even as also we are known.” But these essays are not, in any sense, evidence, and they are not, legitimately, in this case, since they profess to state a great number of facts for the information of the court, yet (unlike all legal ways in which courts get facts) they are not taken by examination and cross-examination in court, and are not under oath anywhere. They are, from the manner in which they are obtained, open to the charge of an inevitable bias; they show such on their face, and they are not in the form, or of the tenor, that the evidence even of doctors should be. Personal or professional eminence does not constitute, either or all of them, .a court or a jury, and, therefore, they are not to give a decision in this case.
It is true, that, in order to throw all possible light on the mental condition of parties, who, or whose acts, are called into court, great latitude of testimony has been allowed. • And where there has been no competent medical observer of the facts (and even where there has been such, as supplementary) the opinions *75 •of professional experts, based upon the testimony of other witnesses, as to the facts, have been introduced. The experience of courts has, however, not found the latter to be the safest kind of testimony. It is generally asked (by counsel) and frequently given, as if it were to be conclusive, and to leave to the jury nothing to do but to concur. Even where a physician founds his opinion (as to any one’s state of mind) on his own observation, you give his opinions no such authority. You examine him in detail (as a witness) as to the particulars which he saw, and how, or why, they, as indications of diseased intellect, constitute a basis for his opinion. And both by his own evidence and manner, as well as by calling other experts, as to his reasons, in detail, you are able to apply a test to his opinions, general and particular.. Thus it is left to the court or jury,to say of his (as they, and they only, are entitled to say of all) testimony, whether his opinions have been formed or given honestly or dishonestly, or under a bias which disqualifies him; whether they present him to the court in a light to be, or not to be, relied on ;• and also, whether, if both formed and given ever so fairly, he is competent to form trustworthy opinions.
As to the form in which his opinion is to be asked or given under the most favorable circumstances, where he is shown to be conversant with the particular disease inquired of, and where the person inquired about is in court and the expert sees him during the whole trial, and hears all the testimony, he (the medical witness) cannot be asked his general opinion (i. e., his conclusion from all the evidence) as to the state of the party’s mind at the time of doing ■ the act. • He should speak as to particular facts, as symptoms of a particular diseased condition, and how far such symptoms are usual, probable, or considered sure, indications of that condition. Thus presented, his opinion becomes definite, and you then can apply to it the test of a direct and explicit cross-examination. (See 47 Eng. Com. Law R., 129, note.)
In no event should any opinion as to matter of fact (no matter how high, his professional standing, who gives it, or *76 how honest he may be, or how apparently intelligent the opinion) be produced or received as anything but evidence, and that only in the way that other evidence is, if we are to preserve even the appearance of a trial, whether by court or jury-
Avoiding, then, as far as may be, general or scientific discussion as to the symptoms and probabilities, let us proceed to examine the evidence as to what was the testator’s condition at the several material dates, subsequent to the attack of paralysis, in July, 1849. And in giving the dates, - it will be of use to specify what was done at each date, premising them all by a statement of the general tenor of the original will, and of those respects in which that was modified by the different codicils.
The original will of 1842 (conceded by all to be valid) contains a number of specific devises of legacies to different relatives, and gives to his wife his (then) dwelling-house, and a variety of other property, real and personal, amounting in all to between one-third and one-half of his whole estate, which was then valued at between $600,000 and $700,000. It constituted Daniel Parish one of the executors, and gave to each executor a legacy of $10,000, and it had a residuary clause in favor of his two brothers, Daniel and James, by which the two would share equally a residue of about $50,000.
August 29,1849 (forty-one days after his attack of paralysis, which was on the 19 th of July), he made the first codicil,thereby devising to his wife his new and very valuable residence on Union Square, and another valuable piece of real estate. On the 17th of December, 1849, he re-executed this codicil.
Four years after making that codicil (September 15,1853,) he makes a second coclicil, giving to his wife additional personal property, to the amount of $350,000 (more than one-half of the then unbequeathed residue), and giving $50,000 to different charitable institutions. By this codicil he revoked the appointment of his brother Daniel as one of his executors, and revoked the $10,000 legacy to him, as such.
*77 Nine months thereafter, June 15, 1854, he made the third codicil, thereby giving to his wife, in case she should survive him, the whole residue of his estate, and revoking, in case she so survived him, the residuary clause of the will of 1842. The entire estate was then about $1,400,000.
The first codicil is not now before us. And before proceeding to examine the direct testimony as to the execution of the last two codicils, both of which were drawn by Mr. Daniel Lord, and their execution witnessed by him, it is due to his character and position to say that, whether or not (in reference to the question of undue influence or control) the maxim' se scripsit hceredem applies to Mrs. Parish (and that will be duly considered in its appropriate place), he, as a witness, stands in, no such light.
All honorable lawyers, all whom the profession and the courts should not spurn from among them, understand that the one who is called to draw a will is the agent and the ad-visor of the testator and of him only. And if the one so called intentionally, even by the least indirection, mislead the feeble or pervert the intention of his client, especially if he himself perform the whole act, to do which he is conscious that the ostensible testator is not competent, no terms are too severe, for his baseness.
The first duty of one who assumes to act professionally on such an occasion, is to ascertain to his entire satisfaction that the testator has understanding sufficient to know what is the act about to be done, and how he wishes it to be done, and that he can in some way make manifest his wishes and understand whether or not they are complied with. He is then to take care that he knows what those wishes are, and then to comply with them; he is then to let the testator know, carefully and deliberately and fully, the contents of the will as drawn, and to see that it be both clearly understood and entirely assented'to; then', and not till then, may he, in the proper discharge of his duty, see that it be executed with the formalities which the statute requires.
*78 Such Mr. Lord undoubtedly knew to be his duty, as very distinctly appears .from the manner and the substance of his testimony. ¡
To proceed with the second codicil, executed Sept. 15th, 1853, the direct evidence is given-by Mr. Daniel Lord and Mr. Charles A. Davis. To find out how this was to be drawn Mr. Lord had five several interviews, on five different days, from Sept. 6th to Sept. 13th, at all of which he understood Mr. Parish in his attempts to call attention and procure suggestions.: Mr. Parish expressing.plainly, by his assent, when the suggestions met his wishes, and-by his dissent as plainly showing when the suggestions did not reach what he wanted. Por the purposes of this codicil Mr. Parish had before him, and appeared to understand, a statement of the items of . all his property; of all the items disposed of by his will and the former codicil, with a valuation of each item of real and personal estate. Mr. Lord says: “ I had no doubt, and I have not any, of his entire capacity to understand what he was doing and the effect of it. I was quite gratified at the better condition of his bodily health and the inteTligen.ce with which he acted.” On his cross-examination he says: Mr. Parish assented to each item that was put in, and dissented from some proposed ones, which were thereupon omitted; and that the assent was distinct and unmistakable; and that the reading, prior to execution (with Mr. Davis holding one of the copies and following the reading), was clearj distinct and deliberate, and assented to.
Mr. Charles A. Davis, the other witness to this codicil, was an old intimate friend of Mr. Parish, and was in the habit of visiting him frequently (whenever Mr. Parish was in the city), from the autumn after his attack, until a week before his death. Of Mr. Parish’s general condition, this witness says, “ he gave indications of dear comprehension of matters he did comprehend, and when he.did not comprehend, he gave clear indications that he was not understood, that his inquiries were not understood; that they had' not reached the subject he was inquiring about.” He says the subjects which seemed most *79 to interest Mr. Parish, had relation to property, its sales and values. “ He always gave evidence to me of unimpaired mind, but an incapacity of expressing by articulate sounds what he exactly desired, unless a question was put, calling for the answer, yes, or no.” This witness proves the careful, clear, distinct reading of this codicil to Mr. Parish, before execution, and his deliberate and plain assent to the same, and the due and formal execution of the paper.
As to the third codicil, executed June 15, 1854, the direct evidence is given by Mr. Daniel Lord, and Mr. John Ward. Mr. Lord says, that it was directed and approved by Mr. Parish, and duly executed, and that, at that time, Mr. Parish’s “ mental capacity was perfect for making a codicil of this kind. He fully understood it, and fully agreed to it.” Mr. Ward testifies, to the reading and execution by Mr. Parish’s nodding assent to the papers, and to different questions as to its execution, put by Mr. Lord. Mr. Ward subsequently testified to his having had, in 1854, transactions (in selling notes) with Mr. Parish, in which he, at the time, understood Mr. Parish to take part, and to assent to the purchase of the notes, and the rate of purchase. His acts show his opinion as to Mr. Parish’s capacity, but as an opinion, it was not asked by either side.
This gives us all the proof there is in the case of what, at the several times of executing these two codicils, Mr. Parish did, and of what he actually understood. There is a great deal of proof, more or less direct, and more or less intelligent and trustworthy, as to his general state of mind, and what he could .understand, and what he could not; what other persons could, or could not understand him; and a great many independent facts relating to his doings, his appearance, and his habits, are also in evidence. It is impossible here to do more than select such as seem most important.
The undoubted facts, as to his condition, are: that on the 19th day of July, 1849, he was attacked, is^a counting-room in Wall street, with paralysis, not of the severest type, and was removed to his own house; that he became conscious in a *80 short time, and rather rapidly recovered from some of the effects of the attack, but that his right side was never restored to use in any great degree; his right leg was of partial use, his right arm of none; the right side of his face was affected so slightly that a person who did not know his condition would not have perceived that it differed from its former state; his organs of speech were, and continued almost wholly paralyzed. To some persons, his “ no ” and “ yes ” were quite distinct; to others, they were about as distinct as a good part of the (commonly) half-articulated mumbled syllables of the language; while to some, they were, as articulate sounds, unintelligible, and to others, they were entirely unintelligible, unmeaning. He was, by most persons, understood to nod in token of assent or affirmation, and to shake his head (in the usual way) for dissent or negation. He had a habit of extending and raising his left hand and arm', and some of his fingers, with an accompanying inarticulate and irregular sound, which act and sound some persons understood as making inquiry, or as suggesting a desire or wish, which, then, was attempted to be ascertained by guesses at his meaning; the guesses being continued if he, by his negative sign, showed that his wish had not been appreciated or hit; and the guesses being stopped when he, by his affirmative sign, showed that his object had been attained. His sight remained as good as it had been prior to the attack, and his hearing was quite acute. His face was never particularly expressive, but it continued, after his attack, about as much so as it was before. His general physical condition was good, with a moderate degree of strength. His left arm and hand, never much affected, were so restored that they apparently remained in nearly their former condition, he having the free and effective use of them for ordinary purposes,— with them helping himself to his food and drink as well as usual, or nearly so. He could not, or would not, at any rate he did not, ever learn to write with his left hand, to the extent of one intelligible or legible word, either on a black board (allowing that one was tried), or on a slate, or with a lead pencil upon paper. A child’s alphabet *81 on a card (or cards), in capitals of over an inch in length, was once placed on a table before him, but he did not use the letters to spell any word, and brushed them at once off the table. He thus remained, without any means of suggesting any ideas of his own, (unless by pointing at a-visible object), except his said method of inquiry; then relying on the quickness and intelligence of others, to find out the subject he was seeking for.
Upon this general state of facts, the contestants argue, that his failure to establish, in any way, some means of directly communicating his ideas to those about him, when there are so many ways, which (they insist) are easy, obvious, almost natural, is, of itself, sufficient evidence that he lacked the mental capacity to learn, or practice either of those methods. On the other hand, the proponents claim that he voluntarily refused to adopt those methods, from which he revolted as childish, while as to others; (writing in any way,) the failure of his. first faltering attempts discouraged him, and he gave them up in despair. And, indeed, some of the witnesses testify to plain indications of this latter feeling. If we are to resort to opinions, perhaps these opinions upon what the' witnesses -saw are as valuable as other opinions upon what the givers thereof did not see. Perhaps, taking both sides of this argument (as above stated), there can be no better illustration of the dangers .and difficulties, with which we shall be surrounded, when we venture upon scientific arguments and opinions, as to what might be, instead of confining ourselves to the evidence of what was. One intelligent and honest witness, testifying that, in a given matter, he was understood and answered, may safely defy all the learned treatises that can ever be written to show that he could not be. Pact is above theory; as the scholastic argument against the possibility of motion, was effectually answered by moving.
To proceed: The evidence of the attesting witnesses has been given; and it will hardly be found, on careful reading, to have been really weakened by cross-examinations. There remains to be applied to it, the test of any other and incon *82 sistent facts which are in evidence, as well as the opinions, one way and the other, of the many witnesses who saw and visited Mr. Parish.
Mr. Joseph Kernochan, an old and intimate friend of Mr. Parish—his partner for many years—closely connected in business with both Henry and Daniel Parish—is much relied on, upon the .part of the contestants. He testifies to seeing the testator very frequently and very familiarly, after his paralysis as before. That, from his observation of Mr. Parish, from 1849 to his death, he did 11 not think he kneiv much;" “ when a person neither writes, nor speaks, nor does much, it is difficult to judge; I don’t think he had much mind." He says, also, that on being requested, a few days after the attack, to take a general power of attorney from Mr. Parish, he hesitated, and asked Drs. Johnson and Markoe as to Mr. Parish’s capacity to do business. On their saying that his having such capacity was very doubtful, he declined to take the power. However, on a cross-examination, he says that one reason for so declining was that he thought he would have to manage generally the property and affairs, and “ he declined undertaking a great deal of work for no pay" (a sound reason, but'one not having much re^rence to Mr. Parish’s mental capacity.) He says he interpreted the nod of the head affirmatively, and the shake as a negative; but “within his hearing” there was never any distinct articulation, but “ a sound always very much alike;” which might very well be, as he testifies that his own “ hearing has been very imperfect for eighteen or twenty years.” His estimate of Mr. Parish’s powers does not seem to have manifested itself to the family, as, on his return to the city after the execution of the first codicil (he having been absent when it was executed), Mrs. Parish told him it was made, and in whose presence, and its contents. Yet he suggested no question of inability, and no test to ascertain it. He was in the habit of talking to Mr. Parish of the current news, of the commercial intelligence, of the rise and fall of the stock and bond market, and of the rate of interest. He says: “If I knew anything I thought he would like to hear, I would mention it to *83 him, without expecting any answerand “ I think his hearing was very good, from his appearing to notice anything that was said in his hearing.” In January, 1850, he asked Mr. Parish if he wished the annual balance-sheet of his property and was answered affirmatively. And in the spring of that year he advised Mr. Parish to give to Mr. Conry a power of attorney to sell some city bank stock in Mew Orleans; and when the power was executed, he sent it to Mr. Conry. In the same spring (1850), Mr. Kernochan advised Mr. Parish to give a deed (join in a deed) of some partnership lands in Mew Orleans; and received “ a nod, which he inferred to be assent.” He informed Daniel Parish that he had so advised, and that Henry had assented; and he understood (as was the fact), that the deed was executed by Henry Parish (and the others). He applied to Henry for, and received, two or three satisfaction-pieces of mortgages, executed by Mr. Parish with a mark, with one of the Delafields as witness. In view of these acts, his thinking Mr. Parish “had not much mind” will hardly establish incompetency to make a will, or raise a doubt of the competency.
Mr. Folsom, for many years book-keeper of H & D. Parish and of Mr. Henry Parish’s individual business, testifies that Mr. Parish did not appear to respond intelligently or consistently to his questions as to the custody of his tin box of valuable papers, or as to the keeping of his will. Yet in this same interview as to the will, he asked Mr. Parish if he wished to pay him (Folsom) for his services; and receiving an affirmative reply, he suggested amounts: $1,000; assented to: $1,500; assented to: $2,000; an indefinite reply. He continued by asking if Mr. P. wished a balance standing against him (Folsom) on the book canceled; to which he does not give the reply; but he entered on the book, opposite this item, “ canceled by services;” and he continued to do the business. On one occasion, upon Mrs. Parish’s finding fault with Folsom’ conduct, he turned to Mr. Parish and asked, “ Are you not perfectly satisfied with what I have done?” and Mr. Parish “put his hand up” (which Folsom took), “and bowed bis *84 head.” And, in April, 1851, Folsom requested Mr. Parish to execute a satisfaction-piece of a mortgage, and offered to witness the execution, and to swear to the signature, to save Mr. P. the trouble of acknowledging it. There is no doubt that he testifies fully to thinking Mr. Parish not of sound mind; and that he narrates interviews and incidents that would seem to justify his opinion. But the medium through which he saw, appears to have been favorable to that impression; and his own course of action (as above) seems inconsistent with the expressed opinion. His letters (admissible to show his bias) give full proof that, from an early day after the paralysis, he had a decided pique against Mrs. Parish, and a decided feeling for the opposite side; and his course was plainly that- of a decided partisan, whose opinion is of little importance, and whose statement of facts is entitled to little more consideration than is his opinion. The bias is too plain and too strong.
The testimony of the nurses and servants and some traders, and that of some gentlemen whose knowledge was slight, closes this part of the contestants’ case. The main tendency of the evidence of the nurses and servants is to show that Mr. Parish did not utter distinctly “yes” or “no;” and that the sounds he did utter had not, in their opinion, a constant nature or meaning. They testify, also, to some acts, which would not be done by a person of sane mind, who had the ordinary means of manifesting his wishes. But there is little in these things to weigh against the statements of intelligent men, that Mr. Parish did show good intellectual capacity, clearly and certainly.
Dr. Edward Delafield (on the part of the proponents), testifies at considerable length, and is closely cross-examined, with a result as favorable to his testimony as would ordinarily be found in the case of fair, intelligent witnesses. His being a brother of Mrs. Parish would necessarily create a bias in her favor; but, with due allowance for that, his testimony has great weight. His answer to one question has so much practical good sense, and is so free from any professional pretension, that it is worth citing in full. He was asked, “ What are *85 the symptoms by which you determine that the mind or intel lect has been affected by this disease (paralysis) ?” He answered, “Not by any physical symptoms; but the point is ascertained by simple investigation of the condition of the mind itself, by presenting to it, in various ways, objects requiring, intelligence.” And as to the fact that this witness so determined in regard to the condition of Mr. Parish’s mind, he says: “ My ordinary intercourse with him gave me the evi dence I wanted, so decidedly as to make no special experiment necessary” to ascertain whether the mind was affected. Had the case been gotten up, and the testimony manufactured, care would have been taken to present to us a sufficiency of “ special experiments,” with very satisfactory results.
Mr. Wiley testifies to a course of business transactions (he being one of Mr. Parish’s former partners, and their interests being then unsettled), which he could not have conducted honestly unless he thought Mr. Parish capable of doing business. He consulted him about a sale of Texas lands, to which Mr. Parish assented; and the sale was made. He testifies that Mr. Parish’s mind appeared to be well regulated as to business he was familiar with, or had been so when in good health.
Dr. Abram Dubois gives evidence of facts to show that Mr. Parish understood him; and states as his opinion, founded on his observation, that Mr. Parish’s “mind appeared to be clear and sound.”
Dr. Wilkes testifies to facts, during his attendance on Mr. Parish for an affection of the eyes; and says, that, from his observation, he thinks Mr. P.’s mind was clear, and capable of transacting ordinary business. To this witness (among others) was addressed, by the contestants, this question: “ Supposing it true that Mr. Parish' knew very well how to read and write, before the attack; that, during an illness of six years’ duration, he was unable to say anything more than a simple negative and affirmative; and that he had lead pencil and paper, slate and pencil, blackboard and chalk, and such block-letters as I have described (each letter of the alphabet, of large size, on a *86 separate block), put before him; and, though urged to it, never succeeded in making, a word, or communicating any idea in this way: would you still think that his mind was clear, and that he was capable of transacting the ordinary avocations of life?” He answered, “That would depend, in some degree, cm the manner in which the experiments were made, and the duration of the experiments, and a variety of concomitant circumstances. But I drew my opinion of the clearness of his mind, &c., from actual observation ; seeing him in person; addressing questions directly to him; and being satisfied of his correct and intelligent answers." This answer not being satisfactory, the question was repeated, and he answered: “If I was allowed to spend three hours in the society of a person, and addressed questions to him, and received intelligent answers, I would, in spite-of any opinion as to these experiments, believe he was capable of transacting' ordinary business.” (This whole question is here stated, because the contestants lay great stress on its statement of points.)
Mr. Bryson, cashier of the Phenix Bank, says that in August, 1853, he advised with Mr. Parish as to the transfer (for purposes of reorganizing) of his stock in -that bank, and received his assent by a distinct “yes;” that Mr. Parish made his mark to the transfer without any assistance, and in the proper place, without its being pointed out to him. This witness says that, so far as his observation extended, Mr. Parish was fully capable of transacting, business. His narration of the transfer is fully corroborated by Mr. Dunning, a clerk in the.bank, called to witness the transaction.
Dr. Taylor and Dr. Wheaton speak in similar terms of the fact that Mr. Parish’s countenance, after the attack, ■ had as much intelligence and expression as it ever had; and they are decided in saying that it appeared to them that he was fully aware of his condition, and had a very clear perception of what was going on around him.
Huther Bradish says that, from his observation, .Mr. Parish was capable of assenting to, or dissenting from, any matter proposed to him: his expressions of affirmation, and of nega *87 tion, were very strong, very marked, very decided, generally; indicating intelligence, and judgment or decision.
Mr. Henry Whitaker testifies with decided intelligence. He speaks of Mr. Ephraim Holbrook’s (witness to first codicil) conversations with Mr. Parish, varying from half an hour to an hour in length each; generally on business matters, the money market, prices of stocks, &c.; and says that Mr. Parish appeared to pay peculiar attention to these observations, more so than to general conversation; and from his observation he gives his opinion that Mr. P.’s mind was that of a person competent to understand and to transact business; but his peculiar position was such, that it was necessary for him to transact that business through the medium of another person. To a question of purport similar to the one above set forth (as asked of Dr. Wilkes), this witness says, “ I must respectfully decline giving an opinion on a state of facts which has not come within my personal knowledge or observation.” Upon a repetition of the question, and an answer being insisted on, he says, “ Assuming all these facts, I still retain my opinion, that Mr. Parish was able to understand business, and to transact "it through the medium of others,.as I have before answered.”
Mr. Henry H. Ward was the partner of John Ward (the subscribing witness to the third codicil), and was the person who conducted most of the sales of notes to Mr. Parish in 1854. He says that, in those transactions, he always supposed Mr. Parish understood him, or he would not have transacted business with him: he considered he was doing business with Mr. Parish; and that, from those transactions, he considered him capable of attending to his business, and a close man in money matters.
Mr. Grinnell’s testimony is very worthy of note, not merely as to opinion, but as to facts; the narrative of which is as natural as it is clear.
Dr. Markoe’s testimony is important, in itself, and for its collateral bearing on Mr. Parish’s failure to acquire, or practice, any accurate mode of communicating his ideas. This witness experimented with the application of the galvanic *88 current upon Mr. Parish, to restore the power of speech; and he says Mr. Parish appeared to be “ extremely disappointed at the failure of our attempt, and finally refused to have it done any more. The trials were short, as a few minutes would suffice to discourage him, so that he would not go on.” This witness gives, also, a narration of the successive efforts towards using the right arm and the right leg; the latter of which succeeded, and the former did not. From his observation, his opinion is that Mr. Parish’s mind, from the fall of 1849 to his death (with the exception of the last two weeks), was sound. The exception is here noted, because, in the argument, it was claimed to be Dr. Markoe’s statement that, during these two weeks, the mind was unsound; whereas he subsequently states that he made the exception because he did not see Mr. Parish at all in those two weeks.
The general truth, that some persons, (paralytic, or not,) have been able to write with their left hands, has very little bearing on the case; as a great many persons, who are neither paralytic nor otherwise disabled, and who have the full use of their right hand, can still write very legibly with their left; which some others cannot do at all. Mr. Parish did not, and for some reason or other, most certainly could not. But unless we can find out more about the actual muscular and nervous power of that left arm, there will be no way of determining that inability of mind had anything to do with inability of hand.
There are other witnesses; but their testimony would not be considered as materially varying the case, from what has already been stated. The very decided preponderance of the evidence that is founded on observation is in. favor of clear and undoubted testamentary capacity ; certainly nothing shows him non compos mentis. That is not established by proof. .
As there is nothing complicated, or difficult, in the purport of either of these two codicils, there is no reason for saying (even were it material,) that by either there is, in that view, any doubt thrown upon the proof that the testator fully comprehended the acts he was doing.
*89 There remains for consideration the other question of fact: Was either, or were both, of these codicils obtained by the undue influence of Mrs. Parish ? I use the term, undue influence, not in the sense of fraud (as by deceiving the testator), but as signifying a controlling influence, which did not leave him, in this respect, a free agent. If, in effect, she wrote her will, it should not be held valid as his.
Unfortunately, a strong pecuniary motive is frequently found too strong for most other human motives to contend with; and the difficulty of resisting great temptation of this sort is universally acknowledged. Where the way to wealth lies through the comparatively easy road of acting upon the feeble mind and the feeble body, by attentions on the one hand, and by importunities on the other; where, for a long time, the opportunities for using such appliances are continued, and the chances for interference therewith are slight, and at rare intervals; it is cause rather for regret than for surprise, when we find that the means have been used, and the result attained. Yet, then, the law is not the less bound to apply to the transaction its own rules; and to declare only such instruments to be binding, as combine the full, free volition of the maker, with his intelligent comprehension of the act.
In regard to this part of the contestants’ case, there can be no doubt that the burden of proof is upon them. It is an affirmative issue on their part; and to be by them made out by preponderating evidence. That evidence may, of course, be either direct or circumstantial; whichever they are able to produce. But, of some kind of evidence, there must be sufficient to establish the fact. For this purpose, it is entirely legitimate to consider the position of the testator; his family relations; the condition and amount of his property; the nature of his will, and of the codicils; the manner in which they apportion his property; and how far that manner is consistent with, or varies from, the ideas he is known to have entertained when in health.
The first codicil was executed before it was really ascertained what would be the result of his disease; whether life *90 would be long continued, or suddenly cut short by recurring attacks ; and the making of it seems to have been the originating cause of many, perhaps of all the difficulties, which have brought the affairs of this estate into the courts.- It was, perhaps, natural enough, that the fact that such a codicil had been made’for the benefit of Mrs. Parish, should give to Mr. Parish’s brothers and sisters an impression that she was but commencing, and that promptly, a course of grasping, which would end in entirely depriving them of any benefit from his large estate. And that they had such an impression, seems to have been at once shown to Mrs. Parish, certainly injudiciously, and in a way to irritate her. Had such feelings been suppressed by them, while they kept on in a course of merely such increased attention as the condition of the invalid not only warranted, but called for, they would have been in a situation to judge for themselves of his state, bodily and mental; and to have such observations made by others, as would have satisfied themselves, and enabled them to make full proof. At the same time, Mrs. Parish, not being treated as if suspected, would have been less likely to do anything unfair pertainly she would have had no cause (which she could have called an apology) for being vindictive.
Mr. Folsom’s conduct, (as to its probable effect on her), even granting that it sprang from the best of motives, was very ill-judged; and she could hardly be expected to suppose that his course was not fully understood and approved, even if not instigated, by Mr. Daniel Parish. • That it was not so, is nothing to our present purpose.' It appeared so; and she, no doubt, believed it to be so; and she would naturally act on that belief. When Mr. Folsom refused to let her have the box containing her husband’s papers, or to have his will, he did what was as offensive to her as anything could be. He thereby said, plainly and explicitly, that, she was not to .be trusted; that he supposed her capable of almost any degree of baseness; of mating away with the property of her husband, and its vouchers, and of turning t® an improper account her knowledge of the contents of his will, or even of destroy *91 ing it. It hardly required a confirmation from his letters (in evidence), to make any one sure of his feelings. And he took good care not to have any such impression effaced from her mind, by any act or omission of his. NTor was there any conduct, on the part of Mr. Daniel Parish, to change her opinion. The spirit of contention seems to have been early roused, and to have been ameliorated by no attempts at concession; and if it worked out its natural results, neither party should be disappointed. Generally, the beginning of strife does not consider where it is to end; and in its progress, a great many things are done, which, ,at the beginning, would have startled either party. Mrs. Parish, insulted and defied, may well have been a very different woman, from what Mrs. Parish, treated as a lady, would have been.
After the opposing parties had thus stood in open or ill-concealed hostility for four years, the second codicil was made. Any estrangement between Daniel Parish and his brother was' then an enforced one — enforced by Mrs. Parish. During this period a large amount of property had been transferred from the name of Mr. Parish to that of his wife: and in that process a large number of business transactions had been carried on with Mr. Parish’s concurrence.
For this whole period, though he saw many of his friends and received from them the current information of the day, and manifested an interest in business matters, and was considered as understanding and being close in money matters, the general medium of all his knowledge of subjects, which were not brought up in the way of common- conversation, was his wife. Other persons, finding by his actions and the sounds he uttered, that' he was wishing something, sometimes made attempts to ascertain what he wished-; and occasionally they succeeded. But, so far as we are informed, she was, with few exceptions, the -only one who really or frequently attained the point of actually understanding him on any subject, which was as it were suggested by him, in his indirect mode.
In the discharge of her very arduous duties, in attention to his wants and watching over his health, she had necessarily *92 acquired an influence to which his state of sound health was a stranger. His daily and hourly dependence upon her for the watchfulness and care that looked to every comfort, had grown into a habit. She, in effect, stood between him and the rest of the world, the sole means of intelligent general communication. In most matters he had no motive for resisting her influence; in some his diseased bodily condition rendered her necessarily imperative to preserve him from injury; and the 'constant recurrence for years of this influence and of his obedience to it, must inevitably have rendered that influence one of predominating power. It is in proof that his natural firmness and perseverance' were so far affected by his disease, that he was easily discouraged from continuing his attempts to recover his speech. And it is but natural that his firmness to resist importunity and control should have shared the same change. The whole evidence of the case places him in a position where an enfeebled intellect, though far from losing its intelligence and its capacity to do ordinary business, may well be presumed unequal to resisting reiterated importunities from one in her relative position. It would seem plain that she could have exercised an influence in regard to this codicil, which would not leave to him the exercise of his own free 'will.
Are there any circumstances in this case to show that she did so ? Or does it appear that, having the power, she gained a victory over her naturally excited feelings, and magnanimously forbore to use it?
The whole burden of this codicil is for her benefit. Supposing that it was made under her control, se scripsit hceredem ; nor upon this supposition would Mr. Lord’s presence, and the fact that Mr. Parish assented intelligently and deliberately and in detail to the provisions of the instrument, relieve her from that position. For the influence was easily exercised (when once its subject had been brought to submit to it), and in a way not at all suspicious; a way not likely to be observed by one who had no idea of its existence. And the very fact that he knew himself to be above suspicion, and did not think of *93 being the instrument of another’s practices, would render him unsuspecting and unlikely to be looking for any such practices.
It has been said that this codicil is wholly for her benefit. It is true that the sum of $50,000 is given to different chari ties; but, on the supposition that she made the codicil, and considering that the sum of $10,000 was saved to the estate by cutting off the legacy to Daniel Parish as one of the executors, those bequests constitute nothing more than a decent covering of the general purpose, so that the making at that time of any codicil should appear to be founded on something besides a great benefit to her.
Again, it was entirely natural that she should wish Daniel Parish not to be continued an executor, as he was deemed her especial adversary, and she had forbidden him the house. To exclude him from that office was more likely to gratify her excited feelings, than were even the larger benefits secured to herself. As far as her wishes were concerned, the codicil is consistently framed to further them.
If another codicil be found, made after the lapse of a few months, carrying out the same general purpose, that fact may fairly be considered as concurring with and giving weight to the prior facts. And thus we find that in the course of nine months the third codicil is made, for the sole purpose of revoking the residuary clause of his original will, and of giving the residue (then very large) to his wife, instead of his brothers, Daniel' and James.
This is a brief codicil, of very plain and explicit purpose, very easily understood; and it appears that he did understand it and assented to it. He further attempted to do what Mr. Lord’s sense of justice induced him to prevent — deprive his brother^’ children of the benefits of the legacies and devises . in their favor, which are contained in the original will. His doing this was (in some way, though Mr. Lord does not recollect that it was said broadly and directly) suggested by Mrs. Parish. It must have been so, as Mr. Lord could not have suggested what he so decidedly disapproved; and Mr. Parish was unable to suggest it, unless upon being directly inquired *94 of. Upon the point we are now considering (control), we are to view this codicil as if it did revoke those legacies and devises. Since then it did not, was not according to the expressed intent of the testator. Though suggested by the same authority that made the codicil, the will of Mr. Lord kept it out of the instrument; to Mr. Lord’s credit, not to any one’s else.
So considered, it is a codicil cutting the testator off from the remembrances of the past, severing him from all connection with the future of his own name and of his race, of his néar and certainly once dear blood relations, for the purpose not merely of giving tó his wife, a lady quite past middle age, the means of retaining her own elevated position in society, with every appliance of elegance and luxury, but of lavishing upon her wealth beyond her power to use — wealth that must be during her life a constantly accumulating burden, and at her death must go to her collateral relatives, who for it would remember her, not him. And it may be further noted that of her relatives those who were most intimate with him were the twin brothers, gentlemen of about his own age, and bachelors, who could but convey it further from his affections.
If it be answered that he had become estranged from his kindred, it is proper to ask how and why. It was not prior to 1849, for there is nothing of an earlier date that deserves to be considered on that subject. And after his attack, what adequate cause therefor was given to him ? The difficulty with his wife was not of so ■ grave a nature as to call for all these serious consequences, worked out by a purpose which gained strength with years of weakness. To her it might have been a festering sore, an apology to herself for a spirit which failed to show itself noble by forgiving. But it was not sufficient ground for his making successive codicils to carry out her will instead of his own. We may not judge her for being so far human. But we may apply the rules of law to her acts and to his.
If it be found that for such a cause, or for any or with any' intent, she, having the absolute power so to do, arbitrarily secluded him from the society of these relatives, and that such *95 seclusion was naturally followed by a weaning of his affections from them, and the result is an entire change of all the purposes in their favor, which were expressed in a well-considered will, made while he was in full health, it may well be held that such a course, carried out with one whose helplessness rendered him utterly unable to manifest to others his wish as being contrary to hers, or to obtain such wish as against her will—that such a course was but a part of a well-adjusted and carefully managed train of controlling influence, the whole of which has reference to and is connected with the final result, all combining to make him her instrument to work out her ends.
Direct evidence of her control in these matters—of her actual exercise of undue influence in procuring her will to be executed by him—could hardly be expected. The means of keeping the influence out of sight were too many, and of too easy application. But when such is the array of circumstances ; when such a result is attained without anymore substantial, apparent cause, we are justified in saying, from the evidence, that the only cause to be inferred, which is in the least degree adequate to produce the result, is a long-continued, persistent, overpowering influence to which his condition rendered him peculiarly subject, and which she was as peculiarly in a position to exercise.
Such a disposition of property we are'not bound to sustain. We ought to say, that, as matter of fact, the last two codicils were obtained by the controlling influence of Mrs. Parish, unduly exercised, and that, in regard to them, the decision of the Supreme Court, confirming that of the surrogate, should be affirmed. ' ■
It must not be supposed that this question of undue influencé (or control) is to be approached or considered in any but the most careful and deliberate manner. The relation of husband and wife is too sacred in its nature, too closely intertwined with all the highest interests of social civilized life, to allow us to bring down their motives and actions to the.standard that would exist between mere parties to a contract, or *96 even to that of any other of the nearest relations. We are to bear in mind their mutual duty to love and to cherish, in sickness and in health, and the many records of noble devotion which attest how well, in helplessness and weakness, through watchings and through weariness, woman has proved herself the solace and succor of him to whom, in his hour of strength, she clung for support.
The relation is not within the class that is ordinarily open to suspicion as to its probable or actual influence on the mind of a testator. A wife has a right to be first in influence with her husband. Any other doctrine would forget
-“ the great vow,
Which did incorporate and make them one,”
and would leave her a wife in name, but with limited and abridged attributes. The more truly that relation is engrossing, the stronger should be, and will be, the influence of one with the other; and the companion of years, the sharer of affliction, the soother of sorrow, the one trusted and unwavering, is to be upheld in exercising, what she cannot but obtain and keep, greater influence, and better, than that of all the world besides.
But, in dealing with the business of the world, we shall be compelled to acknowledge the sad truth that even this relation may not be proof against the intrusion of improper motives; that its purity may be tainted by the malign passions and influences from which so few are wholly exempt. The suggestions of evil passions may be listened to until they effect an evil purpose. So that every case in which the question of undue influence, or of control, is raised, is to be carefully examined on its own facts; and upon these, and not upon what we wish to be true, or what ought to be true, the decision must be founded. And while we enter on the investigation with the principle that the wife’s great influence is legitimate and not to be suspected, yet we may find that even a wife has been misled by the worse part of her nature. And while sympathizing with her trials and acknowledging the force of the circumstances to which she yielded, we may be obliged to see *97 and to say that she did yield, and that the law has set bounds beyond which even a wife’s influence cannot be allowed to go.
Denio, Wright, Allen and Smith, Js., concurred in these propositions of Gould, J.:
In law, the only standard as to mental capacity in all who are not idiots or lunatics is found in the fact whether the testator was compos mentis or non compos mentis, as those terms are used in their fixed legal meaning.
Such being the rule, the question in every case is, had the testator, as compos mentis," capacity to make a will; not, had he capacity to make the will produced. If compos mentis, he can make any will, however complicated: if non compos mentis, he can make no will — not the simplest.
At common law, and under our statutes, the legal presumption is, that every-man is compos mentis; and the burden of proof that he is non compos mentis rests on the party who alleges that an unnatural condition of mind existed in the testator. He who sets up the fact that the testator was non compos mentis, must prove it.
The opinions on that subject of medical men, as well actual observers as experts, are mere evidence, and are to be produced in court, and under oath, as other evidence is.
Selden, Ch. J., delivered an opinion, in which all the judges concurred, so far as it relates to the appeals of Ann Parish and Mrs. Sherman. As to the rest, it is a dissenting opinion. He said:
This case, with its voluminous proofs, its extended medical arguments and elaborate briefs, has swollen to such a. size that it is quite impossible for the court, in an opinion of reasonable length, to take a complete and comprehensive view of all the various aspects in which it is presented. I shall attempt no more than barely to group a few of its prominent features in as brief a space as possible, selecting such points as, while they may not appear to others as the most striking and impor *98 tant, see.m nevertheless to me to be not only pertinent but entirely decisive of the case.
Were we at liberty to entertain, at the outset, a wish as to the conclusion to which we are ultimately to arrive, it would undoubtedly be that, although we might find that the codicils were invalid, we might also find that the will itself was revoked, and that Henry Parish died intestate. This result, while it would give to the widow a very bountiful provision during' her life, and a large estate to be transmitted to her relatives upon her death, would, at the same time, place the brothers and sisters of Mr. Parish upon a footing of equality as to the residue.
But, notwithstanding the very ingenious argument of the counsel for the sisters of Mr. Parish and a natural inclination to give to that argument its fullest force, I have been unable to see how it can with propriety be held that the will was revoked. Admitting the soundness of the argument" that testamentary capacity may be divided into the power to conceive ideas and the power to express them, that the latter is as essential to the competency of the testator as the former, and that a person may well be capable of expressing the simple desire to revoke a will and yet quite incapable of adequately communicating his wishes in regard to the complex provisions of a new will, still it can hardly help the counsel’s case.
The argument applies solely to express and not at all to implied revocations; The only revocations here are those contained in the second and third codicils of the legacy to Daniel, and of the residuary clause in favor of Daniel a,nd James Parish. How, conceding that in a case where a testator, apparently intelligent, but whose power of communicating his ideas was limited, had in proper form revoked a previous will, and then by a subsequent and distinct act had made another will, it would be possible to hold the revocation valid, on the ground that the intention to revoke was clear, and the second will invalid, on the ground that it did not sufficiently appear that its pro- ' visions were in accordance with the real wishes of the testator; still the doctrine cannot, I apprehend, apply to a case where *99 the revocation and the new provisions are contained in the same instrument, and are part and parcel of the same transaction ; for the very plain reason that it would be impossible in such a case to say that the testator would have wished to revoke the former will, except in connection with the new disposition made of the estate. The codicils cannot, therefore, be held valid as to the revocations which they contain, and void for want of testamentary capacity as to the residue.
The' revocations, whether total or partial, in this case, then, if any, mustbeimplied. Without examining the question whether the circumstances relied upon by the counsel would amount to an implied revocation at the common law, it seems to me that our statute (2 R. S., p. 64, § 43, et seq.), presents an insurmountable obstacle to the establishment of such a revocation here. The notes of the revisors, upon those sections, show conclusively that it was their intention to preclude all implied revocations except such as were expressly recognized. They say, in terms, that the provisions contained in the sections referred to, “ it is believed, dispose of the whole doctrine of implied revocations.” Theeffect of these provisions was considered by this court, in the case of Langdon v. Astor's Executors (16 N. Y., 9), where a distinction was taken between the ademption and the revocation of a legacy ; and where, although the court held that there might still be an ademption or ante mortem satisfaction of a legacy, it was nevertheless conceded that since the statute there could be no implied revocation, except such as the statute contemplated. Judge Dewio, by whom the opinion of the court was delivered, after stating the nature of the implied revocations enumerated in the statute, and the distinction between such reservations and ademptions, says: “ The courts cannot, consistently with the statute, hold that any other mere change of circumstances will amount to an implied revo. cation.”
The counsel suggests a long list of cases in which he supposes there must, of necessity, be a revocation, notwithstanding the statute. But these are mostly cases where the devise, or legacy, had.become inoperative by: reason of the destruc *100 tion or alienation of the subject-matter of the devise, &c., prior to the testator’s death. Circumstances of this sort do not necessarily work a revocation of the will, but merely operate to prevent the beneficiary from enjoying its fruits. The will may nevertheless be proved, leaving its effect to be determined when the devisee or legatee prefers his claim.
As to the testator’s expressed intention or wish to revoke or change his will, upon which the counsel seems to rely, nothing can be clearer than that such an intention, to be of any avail, must be carried into effect in the manner prescribed by the statute. As a mere auxiliary to circumstances tending to effectuate an implied revocation, it is useless, as there can be no such revocation except in the cases for which the statute provides. It is impossible, therefore, to sustain the appeal of the two sisters of Mr. Parish.
The remaining questions relate to the validity of the second and third codicils to the original will. It is insisted that these two codicils are void, on the grounds, first, that the testator was mentally incompetent, at the time they were executed, to make any alteration of his will; and, secondly, that they were obtained by the fraud and improper influence of Mrs. Parish.
It did not appear, from the oral arguments of the counsel, at the hearing, that they differed essentially as to the degree of intelligence required to enable one to make a will. But their printed briefs present very opposite theories on the subject, and I cannot consent to pass the question without remark, as I am unwilling to have it inferred that I assent to the rule in respect to testamentary capacity, supposed to have been established by several cases in this State, especially the case of Stewart v. Lispenard (26 Wend., 255). That rule is said to be, that while an idiot cannot make a valid will, yet one who has any mind at all, however low his grade of intellect, may do so; that the law on this subject does not distinguish between different degrees of intelligence, and that to deprive a man of testamentary capacity, he must be totally destitute of reason and understanding.
*101 Considered philosophically, it is manifest that this rule cannot be sustained. It assumes that it is possible to draw a definite and precise line of distinction between idiocy and mental power. The fallacy of this assumption it requires no argument to prove. If, as I suppose, every perception is an act and every idea a state of mind, then to distinguish a man from a tree or a house from a horse is indicative of mind. But I desire to test this rule, not by any mere metaphysicáreasoning, but by facts and principles familiar to all. Almost every one of ordinary experience has known various persons who were classed, both in common parlance and in law, as idiots, and must have observed that while some of these persons have more and some less intelligence, few, if any, are entirely destitute; that most of them know their friends from strangers, manifesting affection for the one and aversion for the other; and that many have the power of speech, not imitative merely, like that of the parrot, but expressive, to some extent, of thought, of feeling and of will. All this requires intelligence, and intelligence proves mind; idiots, therefore, have mind, and the difference between them and a Bacon or a Newton is a difference in degree alone.
It is said that this rule having been established in this State by repeated decisions, it is too late now to call it in question. But no amount of authority can establish a rule which is self-contradictory. If it be, as I deem it to be, undeniable that idiots, or, if not all, at least some persons belonging properly to that class, have more or less understanding, then the rule in question both affirms and denies that such persons have capacity to make wills. There is and can be no doubt that courts, in passing upon questions of testamentary capacity, will and must distinguish Between different grades of intelligence, and that in cases like the present the inquiry is, not whether the testator possessed some intelligence and some mind, but whether he possessed that degree of intelligence which would qualify him to dispose of his estate by will.
It by no means follows, however, that when the inquiry relates to idiocy or mental imbecility, and there is no allegation *102 of insanity, that it is necessary to bring the capacity of the testator up to the standard of what may be called, in any just or even technical sense, “ a sound mind.”
This phrase has two significations. In common parlance it means a mind of more than ordinary strength, discreet and well-balanced. In law it means a mind not affected with insanity in any form. In neither of these senses can it by possibility be made a test of mere mental imbecility. It is s'aid to have a third signification, and to be used as synonymous with compos mentis, and to express the idea of legal competency. It has, no doubt, been sometimes vaguely used in this sense, but such a use is obviously inaccurate, and tends strongly to mislead. Take the case of one but just elevated above the grade of idiocy, who has barely sense enough to escape a commission, and is it not absurd to speak of him as a person of sound mind?
It is held in the case of Stewart v. Lispenard, and to that, under the authorities in this State, I feel bound to assent, that a man "may be capable of making a valid will, and yet incapable of executing a deed, or making a contract for the purchase or sale of property. Our statute which allows wills to be executed at the age of sixteen by females, and eighteen by males, tends to support the idea. A court of equity, therefore, may commit the estate of such person to the charge of a committee, and yet, after his death, give effect to his will. We may properly say of such a person, that he is compos mentis in one 1 respect, and non compos mentis in another; that is, that he has a mind competent to make a will, but incompetent to make a contract; but we cannot say that he has a mind sound for one purpose and unsound for another, without doing gross violence to language. It is obvious, that ‘‘non compo&mentis” and “ of unsound mind ” are not, as the counsel seem to suppose, convertible terms; and that the words, sound and unsound, have no appropriate relation to questions of idiocy or mental imbecility.
If we would have clear and definite ideas on this subject, we must not abandon all precision in the use of phraseology. *103 Non compos mentis is a general term,' embracing all who are deemed legally incompetent to transact business. It includes three separate classes, viz., idiots, persons of unsound mind, and persons of unsound memory. Each of these classes is entirely distinct from both.the others. The first embraces not only congenital idiots, or idiots from birth, but also such as have subsequently become mentally imbecile, from sickness or other cause. The second class comprises all who suffer from alienation of mind, whether they are lunatics, monomaniacs, or generally deranged. The third is confined to a peculiar class, composed mostly of persons whose memories are impaired by age. To mingle these separate classes, each of which has its distinctive features, as is frequently done, tends inevitably to confusion. We have already seen, that idiots cannot be classed with persons of unsound mind, in the technical sense of the latter phrase. It is equally clear that persons of unsound memory belong to a different class from either of the others. Although an unsound memory is proof of an linsound mind, yet the converse is not true. The mind may be unsound in other respects, while the memory remains perfect. Every one of experience in life knows that in advanced age the memory sometimes becomes impaired to such a degree that the individual forgets his friends and his kindred, and is unable, ordinarily, to tell the names or number of his children, or whether they are alive or dead; and yet this same individual may, under some sudden stimulus or strong excitement, exhibit for a 'time his mental powers; memory included, in all, or nearly all; their former vigor. I have had occasion in one instance to pass judicially upon a will, where the testator appeared to be substantially in this condition. It was sought in that case, which is not reported, to apply the rule laid down in Stewart v. Lispenard; but nothing could be plainer than' that this rule could have no application to such a case.
It may be objected to the classification here given, that it does not comport with the language of our statutes on the subject. It is true that the statute concerning wills of real estate, *104 in its enumeration of persons incapable of making a valid devise, specifies only idiots and persons of unsound mind, and omits to name specifically persons of unsound memory ; and that the statute concerning wills of personal property provides that every person of “ sound jnind and memory, and no • others,” may make a valid bequest. These statutes do, no doubt, imply that, in some enlarged and comprehensive sense, the term “ unsound mind ” may be held to embrace both idiots and persons of impaired memory; but, when taken together, they also recognize the very distinctions for which I contend. The first distinguishes between idiots and persons of unsound mind, and the second treats on unsound memory as something distinct from general mental unsoundness. That these distinctions are real, is too plain to be denied; and .it proves nothing against their existence, that legislators and judges have not always observed them. Baron Comyn' has used the terms, “ idiots ” and “ of non-sane memory,” as embracing every class "of persons who are to be regarded as non compos mentis. (See Com. Digest, tit. Idiot.) The statute of wills, 34 and 35 Henry VIII, does the same, by providing that no will of lands shall be valid if made by any “ idiot or by any person of non-sane memory;” hut this only shows a want of just discrimination in the use of terms. It is nevertheless clear that a mere monomaniac, whose mind is perfectly sound, aside from a single hallucinated idea, cannot properly be said to be of unsound memory.
• It is plain from what has been said that persons deemed in law non compos mentis are properly divisible into classes, and that such a division is indispensable to a clear understanding of the subject. It is equally plain that the competency of persons belonging to one of those classes, cannot be determined by rules especially applicable to another class. The question in this case relates to the idiocy or mental imbecility of the testator, and in determining this question it is unnecessary to inquire whether he was possessed of a sound mind or a sound memory, but only whether he retained that moderate degree of reason and understanding which is required to enable one *105 to dispose of his property by will. It is not enough that he should be found to have possessed some degree of intelligence and mind. He must have had sufficient mind to comprehend the nature and effect of the act he was performing, the relation he held to the various ihdividuals who might naturally be expected to become the objects of his bounty, and to be capable of making a rational selection among them. If he had this amount of intelligence, then the codicils which were rejected by the surrogate are valid and should have been admitted to probate, unless it appears that they were obtained by fraud or undue influence of Mrs. Parish.
The positions taken by the counsel for James and Daniel Parish are: 1. That the testator, Henry Parish, at the time of the execution of the codicils in question, and for the last six years of his life, was a perfect imbecile, without reason or understanding, and absolutely incapable of any-rational act; and, 2. That if he can be supposed to have had any capacity, he was, in making the codicils, completely under the control of his wife, by whose fraudulent practices they were obtained.
I have no intention of entering into any analysis of the mass of evidence which has been adduced, bearing upon these questions, but will barely advert to a few items which appear to me of a striking character. There is no doubt that the opinions of intelligent witnesses, although not experts, are to be received upon such an issue. It would be utterly impossible to describe in words the air and manner, the tones of voice and expression of face, from which, to a great degree, the conclusion must be drawn. Personal observation is almost indispensable to accuracy of judgment in such a case, and hence the reception of opinions in evidence becomes a necessity.
Among the witnesses called by Mrs. Parish to support the codicils are her brothers, -Edward, Henry and Eichard Delafield, Mr. Lord, who drew the codicils, Mr. Taylor, a minister and Eector of Grace Church, Mr. Tileston, president of the Phoenix Bank, and Gov. Bradish, president of the Bible Society: all these are conceded by the counsel to be men of the highest character and intelligence. Of the three brothers of Mrs. *106 Parish, Edward was the physician of Mr. Parish, and in constant attendance upon him. during the whole six years of his illness. Henry, a merchant, lived in the house with him during this time, and was with him a great part of nearly every day. Eichard, a major in the United States army, and superintendent of the Military Academy at West Point, had frequent opportunities of intercourse with him during the same •period. Mr. Taylor was also a frequent visitor of Mr. Parish, administered the sacrament to him upon many occasions,x and had other religious intercourse and various financial transactions with him. Mr. Lord drew the codicils; was many times in consultation with the testator-in regard to them, and witnessed their execution. Mr. Tileston was president of the bank in which Mr. Parish was a large stockholder; saw the'latter frequently, and negotiated with him upon some matters of business of great importance. Governor Bradish was a friend of Mr. Parish; visited him several times during his sickness, and received from him personally a large subscription to the x funds of the Bible Society. All these witnesses, without exception, express the most decided conviction that the testator had intelligence, and that he perfectly understood the various matters to which their intercourse with him related. Mr. Lord, in answer to a question as to the state of the testator’s mind upon the execution of the second codicil, said : “ I had no doubt, and have not any, of his entire capacity to understand what he was doing, and the effect of it.” In reply to a similar inquiry as to the mental capacity of the testator upon executing the third codicil, he said: “In my judgment, it was perfect for the purpose of making a codicil of this kind; he fully understood it, and fully agreed to it.” Mr. Taylor, whose interviews with Mr. Parish were very frequent during the time of his sickness, said in reply to a similar question relating to that whole period: “I had not myself the least doubt of the soundness of his mind, nor could I have supposed that any intelligent person could doubt its soundness.” Mr. Tileston had various interviews, and some very important negotiations with Mr. Parish, and to an inquiry as to the con *107 dition of his mind and understanding after his attack in July, 1849, he answered: “ In all transactions between us, I thought he appeared to understand himself perfectly.” Gov. Bradish, who saw Mr. Parish upon several occasions, and obtained from him a large subscription to the funds of the Bible Society, upon being inquired of as to the condition of Mr. Parish’s mind, replied, that, in his opinion, the latter was capable of understanding and did understand what he, the witness, said to him; and that his, Mr. Parish’s “ expressions of affirmation and of negation were very strong, very matked, very decided generally, indicating intelligence, and judgment, or decision.”
It is certainly very difficult to suppose that the four highly cultivated and intelligent gentlemen last named could have had the interviews, and the intercourse they describe, with a man who was substantially an idiot, and not be aware of the fact. I can myself frame no hypothesis upon which such a thing would seem to be at all probable. But if we assume that these gentlemen might all have been deceived, it is quite impossible to believe that the three brothers of Mrs. Parish could have been mistaken. That they should have had daily and almost hourly communication with Mr. Parish for six years, and not know whether he could understand the remarks addressed to him by themselves, Is inconceivable." Intelligence, or the want of it, is manifested, not by speech alone, but by gesture, air, manner and countenance. An accidental concurrence of these might deceive for a time, but not for a series of years, or even days. That the Messrs. Delafield supposed that Mr. Parish had intelligence, is proven, if they are to be considered as in the slightest degree honest, not merely by their own testimony in this case, but by their whole treatment of him as disclosed by the other evidence. They addressed him as they would have done before his attack, conversed with him, consulted him, read to him from the daily papers, told him the news of the day, &c., &c., and never discontinued this practice, until the close of his life. That they could have pursued this course fo'r six years, towards a man without under *108 standing, and still suppose him intelligent, can never be believed.
The counsel for the respondents, James and Daniel Parish', evidently felt the force of this aspect of the case, and we will see how he meets it. In speaking of Mrs. Parish, and the frauds and contrivances by’ which, as he insists, she obtained the execution of the codicils, he says: “We shall find her watching her husband’s person, day and night, never permitting any intercourse between him and others, which might reveal the true condition of his mind. We shall find her interpreting, according to her own purposes, his signs and gestures to selected persons, chosen to have this nominal intercourse with him. We shall find her preparing such persons to play the humble part of dupes, by appeals to their self-interest or their vanity, or by palpably untrue representations and impostures practised upon them. We shall find her desecrating to the purposes of fraud and deception, the sacred name and the' sacred observances of religion, the holy cause of charity. We shall find her ensnaring her oion highly respectable kinsmen in such a net-work that they are at length constrained, in desperation, to become the instruments of her will, to forget, to prevaricate, to misrepresent. The learned and eminent counsel is drawn in by one artifice, the pious minister by another ; the sexton falls by one piece of practice, the bank president and die president of the Bible Society by another; and finally, to fill up, by direct and unmistakable untruth, every remaining chink in the barricade behind which her plunder was to be intrenched, a desperate wanderer from truth and rectitude is obtained as a witness, and induced to out-Herod Herod."
This is a most forcible • and eloquent summary of the positions which it is incumbent upon the respondents to maintain, in order to invalidate these codicils for the want of testamentary capacity. The counsel is clearly right in his conception of the burdens which the case imposes upon him. He sees that it is quite impossible that all these intelligent witnesses should have failed to detect idiocy if it existed, and has taken his positions accordingly. These positions are maintained by *109 a vigor of logic, a force of rhetoric and a perfection of art which, I cannot refrain from saying, has in my judgment rarely been surpassed. But is it possible to assent to them ? They attribute to Mrs. Parish not merely the wickedness but the power of a demon. Women have no doubt existed who were sufficiently vile; but I certainly have never known, I think I have never heard of, one who could have accomplished whát is here supposed; who could have carried on a game of fraud and deception for six years without a misstep; who could have practised her wiles with such success as utterly to subvert the moral sense of a whole family, consisting of such men as her brothers are admitted to be; and not only so, but to “ draw in,” as the counsel expresses it, and make “dupes" of lawyers, ministers and financiers, among the most eminent which the country affords. Is all this credible ? One man may be deceived and another suborned; but that a dozen of the shrewdest and most high-minded men in the city of Hew York should be thus cheated, cajoled and corrupted, surpasses belief.
The witnesses I have named are by nb means all who had intercourse with Mr. Parish, and believed in his intelligence. Those named were selected because they were specially referred to in the paragraph quoted from the counsel’s argument. There were many others belonging to the same intelligent class. Among them I may mention Charles A. Davis and Moses H. Grinnell, both eminent merchants, Leroy M. Wiley, a southern planter, and former partner of Mr. Parish, and James Watson Webb, editor of the Hew York Courier and Enquirer, all of whom testified to their entire confidence in the intelligence of Mr. Parish. Mr. Wiley, who had a great deal of intercourse with him during his illness upon matters of business, when asked as to the condition of his mind, said: “ As far as I could judge, his mind appeared to be well regulated as to business he was familiar with, or had been familiar with, when in good health.” Mr. Grinnell, upon being inquired of whether in his intercourse with Mr. Parish, after his attack, he supposed the latter understood what was said to *110 him, replied: “ I never had any doubt but what he understood distinctly:”
The witnesses called on the part of the respondents are far from expressing the same confident opinion. Mr. Kernochan, the leading witness and the former partner and intimate friend of the testator, did. not think the latter “ had much mind.” In his efforts to communicate with Mr. Parish, he was never “ perfectly satisfied ” that the latter understood him. Mr. Folsom, the clerk of Mr. Parish, before and after his sickness, and one of the principal witnesses for the respondents, in answer to an inquiry as to the mental condition of Mr. Parish during his sickness, said: “ I think through that whole period he was not far removed from an imbecile, still retaining some memory, some lingering ideas of former business habits; constant efforts to express himself, without the ability so to do, without the mind to enable him so to do.” Mr. Ogden, cashier of the Phoenix Bank, had an interview with Mr. Parish upon a matter of business and “ could not understand him.” These are fair specimens of the testimony upon that side of the case. So far, therefore, as the opinion of witnesses are entitled to weight, the evidence, no doubt, greatly preponderates in favor of the testator’s competency.
But opinions are of no importance if they are contradicted by facts. It is necessary, therefore, in attempting to dispose of this case, to look into the history of the appearance and conduct of the testator, during his illness, which is given by the testimony with the greatest minuteness of detail. This I have done, but shall not attempt to reproduce it here. Some of the circumstances which are clearly established, and about which there is no dispute, must no doubt be regarded as somewhat extraordinary, upon the supposition that the testator possessed any considerable mental capacity. Those which it appears to me most difficult to reconcile with this hypothesis, 'are, 1. That although his embarrassment in endeavoring to make his thoughts and wishes known, his power of speech being limited to uttering the words “yes” and “no” must have been a constant source of irritation and annoyance, he either *111 could not or would not learn to write with his left hand, of which, for other purpose's, he still had the use; and 2. That he would not or did not communicate his ideas by the use of block letters. Various hypotheses might be suggested for the purpose of explaining those circumstances, some of which it would seem to me quite possible to adopt.
But whatever may be the difficulty of accounting for these facts, it can hardly be sufficient to counterbalance the great weight of the evidence which goes to show intelligence. In addition to the force of the opinions referred to, and of the suggestions already made,, as to the absolute impossibility of believing, that educated and intelligent men could have daily intercourse for six years with an idiot, talking to him, interrogating him, watching his countenance, observing and scrutinizing his actions, and still believe him to be a man of intellect.
There is much direct evidence of the testator’s intelligence.
I shall not attempt to give a summary of this evidence, but shall simply refer to one or two items which appear to me worthy of special notice.
The manner in which Mr. Parish held intercourse with others, according to the testimony of numerous witnesses, was „ ■ this: He listened with apparent interest to whatever was said to him, or in his presence. If, in the course of conversation, he wished to ask a question, or to obtain any information, he would hold up two fingers of his left hand, shaking them in a peculiar manner towards the person from whom he wished a response. The person addressed would conjecture, as well as he could, what was wanted, and would respond accordingly. It was generally something connected with the subject of conversation at the time. All the persons present would frequently join in making suggestions. If their conjecture was wrong, he would shake his head and say, no, no. If right, he would nod his head and say, yes, yes, more or less emphatically, according to the feeling of the moment. If, after repeated efforts, no one succeeded in hitting upon his idea, or ascertaining his wishes, he would throw back his head and *112 cease to make motions. This was the signal for giving up the * effort for the time.
Mr. Charles A. Davis was in the habit of visiting Mr. and Mrs. Parish. Upon one of these occasions, as he testifies, in the course of a general conversation, Mr. Parish suddenly interposed an inquiry in his usual mode, directing it apparently to him the witness. He, supposing the inquiry to relate to the subject then under discussion, made various suggestions, ■ which were all met with a no, and a shake of the head. After similar efforts on the part of Mrs. Parish, but equally without success, Mr. Parish gave the usual indication of his unwillingness tó continue the trial longer. It then occurred to Mr. Davis, that he had, a few weeks before, spoken to Mr. Parish about a valuable piece of property which he was about to sell, and had afterwards sold, and thinking that the inquiry might relate to the price obtained for that property, he said to Mr. Parish, “I know now what you are after. You want to know what that property brought at the corner of Broadway and Franklin streets.” Mr. Parish, as the witness says: “ instantly exclaimed, ‘yes, yes,’ repeating it several' times, patting me upon the arm, and expressing great gratification at being at o last understood.” Mr. Davis had previously testified, that the. subjects which seemed most to interest Mr. Parish, “ had relation to property, sales, and values.”
I will mention here one other item of evidence, which appears to me still more significant. From the constantly accruing income of Mr. Parish’s estate, during his illness, there were large sums to be invested. Many of these investments were made through the agency of Mr. John Ward, a prominent broker of Wall street, who testifies, that his business interviews with Mr. and Mrs. Parish were had in Wall street, to which they came together in a carriage, stopping in front of his- office. He would go to the carriage, and speak to them; and when informed that they wished to invest, would propose to them, while sitting in their carriage, various securities for purchase — such as stocks, railroad bo'nds, and notes of mercantile firms in the city. When stocks or bonds were offered, *113 time was usually taken to make inquiries. They would ascertain, one day, what securities could be had, and return, in a day or two, and decide whether to take them. But Mr. Ward expressly says, that this was not usually the' case, in respect to. notes. He says, that when notes were offered, they were generally accepted or rejected at "once. Upon cross-examination, Mr. Ward was unable to specify, from recollection, more than one note, which he could be certain Mr. Parish accepted, when offered; and also one, which had been in like manner rejected; but stated his impression to be, that there were others. To the question, “ Was it not the usual practice, in these transactions with your house, for Mrs. Parish to ascertain at one call what notes or securities you had, or proposed to sell, and returning, the next day, or at some subsequent period, and take, or not, as was determined upon ? ” the witness answered: “ I think that was often the case: it was not usually the case, in respect to notes, as I believe.” According to the testimony of Mr. Ward, the offer, on these occasions, was made directly, to Mr. Parish; and when the latter accepted, he did so by a nod directly to the witness. Mr. Ward expressly says, that the choice or selection, in these cases, appeared to be that of Mr. Parish himself.
How, the great, and, if Mr. Ward is not mistaken in his recollection, controlling importance of this testimony will be readily seen. The stocks and bonds offered were mostly those of companies-recently organized, of the credit and responsibility of which, Mr. Parish, from his having been somewhat secluded from the business arena, for a considerable time, could not be expected to have much knowledge. Concerning these, it was necessary to make inquiries. But when the note of a mercantile firm in the city, with the character and standing of which he was familiar, was offered, he was prepared to accept or reject it, at once. It is difficult to suppose that Mrs. Parish had that intimate knowledge of the business firms of the city, which would enable her to decide thus promptly. The decision must, as it would seem, have been made, as Mr. Ward supposes it to have been made, by Mr. Parish himself.
*114 ■This téstimony proves, not only that Mr. Parish had sufficient intelligence to comprehend a matter of business, but that he had self-reliance, decision and will. It also, if reliable, affords unmistakable evidence, that Mrs. Parish had confidence in her husband’s intelligence, and was willing to rely, in matters involving many thousands of dollars, upon his judgment. These facts, if they occurred, cannot, by possibility, be reconciled with the supposition, that the testator was an imbecile. Their effect can only be obviated by assuming, that Mr. Ward is mistaken in his recollection, or that he misunderstood what transpired. The fact, however, that any distinction at all was made between notes, and bonds or stocks, about which he seems to be confident, and in regard to which we can hardly suppose him to be mistaken, tends .to corroborate his recollection in other respects.
I have referred to these items in the testimony of Mr. Davis and Mr. Ward, as specimens, merely, of the evidence in the case. Numerous other circumstances are detailed by the witnesses, having the same tendency to support the opinions of those who have expressed their belief in thé intelligence and capacity of Mr. Parish; the facts of this character, having an opposite tendency, are few, and comparatively insignificant. The evidence of incapacity rests mainly upon his failure to learn to write, or to communicate by the use of block letters; upon his great physical weakness in some respects, and upon the somewhat qualified opinions of the witnesses introduced by the contestants.'
The counsel, for the purpose of adding to the force of the evidence, have introduced, by way of addenda to their briefs, the written opinions of several medical gentlemen of great eminence. Although these opinions are not under oath, yet, considering the character of the authors, the nature of the subject, and the fact, that the reasons for the opinion are in each case so fully given-, they are entitled, perhaps, to about the same weight as if sworn to. I shall treat them, therefore, as a part of the evidence in the case.
*115 To estimate rightly the force of these opinions, it is necessary to divide them into two parts; that is, to separate the part which is purely scientific from the residue. To ascertain the physical condition of a person, in any respect, from all the visible indications of that condition, is the appropriate duty of the physician; to gather together and combine all the external symptoms bearing upon the state of the brain, or any other organ, and to infer from those symptoms its actual condition, is, of course, within his province. So, also, from the ascertained physical condition of an organ, to infer its functional power, is obviously within the range of medical science. When a physician, therefore, from personal observation, or an authentic description of the symptoms of a case, has arrived at the conclusion, that there is a lesion, or any deterioration of the substances of the brain, his opinion as to the necessary effect of their injury upon the intellectual powers, is received in evidence. But it is obvious, that to make this opinion of any special value as a scientific opinion, upon a question of mental capacity, the conclusion as to the injury to the brain must be drawn from indications other than such as are purely intellectual.
If a medical "witness comes to the conclusion, from the mental manifestations of an individual, that his mind is disordered; that he .is insane or imbecile, and from that infers that his brain is diseased, and then tells us that this disease of the brain must necessarily destroy the intellectual powers, we have gained nothing whatever from medical science: we have simply reasoned in a circle. We had arrived at the end of the inquiry as to mental capacity, before touching upon the connection between the mind and the brain, which connection alone brings the question within the scope of that science. Physicians are not necessarily metaphysicians. Their science relates to the physical man and to his' moral and mental condition, only as connected with his physical. Their opinions, therefore, can be considered as properly scientific, only to the extent in which this connection is involved. So far, then, as the medical opinions in this case, bear upon the degree of *116 cerebral disease indicated by the apoplexy, the paralysis, the loss of speech, the convulsions, and other physical symptoms, they are to be regarded as the opinions of experts. But in so far as' they rest upon the evidence going to show a want of intellect directly, and not merely as the result of disease of the brain, they derive very little, if any, additional force from the professional education of the witnesses. A very large portion of these medical opinions is of the latter description, and it is impossible properly to appreciate their force without observing the distinction here made.
It is unnecessary to review these opinions at large. I will advert only to that of Dr. Watson, which is the most elaborate of them all. A considerable portion of this opinion is devoted to showing what must have been the physical condition of Mr. Parish’s brain, as deduced from his complaints, prior to July, 1849; from the attack at that time, and its immediate effects of paralysis, loss of speech, &c., and from his subsequent ailments, such as periodical convulsions, &c., &c. All this falls legitimately within the province of the physician, and from my examination of this portion of the opinion, I must say, that it seems to me, in general, so far as I am qualified to judge of its merits, able and well reasoned; although open, no doubt, to some criticism, as Dr. Clark has very clearly shown. All the medical witnesses concur in stating, that when the disease is simply what is called hemiplegia, that is,, where the lesion of the brain is confined to one of its hemispheres, as is usually the case where one side only is paralyzed, the mind is generally but slightly affected. Those called on the part of Mrs. Parish, think that the disease of Mr. Parish was of this nature, and that only one-half of the brain was involved. Dr. Watson, on the other hand, and those who concur with him, contend, that the symptoms prove a serious disease of both hemispheres, I should find it somewhat difficult to decide between these opposing opinions. Both are maintained with ability, and with some show of authority. If, therefore, the case was found to turn upon this question, its determination might depend entirely upon the onus probandi.
*117 But I deem, it unnecessary to decide which of these two opposing opinions is correct. It is true, if we adopt the conclusion of Dr. Watson, that the whole brain was affected, it would follow, that the powers of the mind were, more or less, impaired. But this would not prove that sufficient intelligence might not still remain, to enable Mr. Parish to make a valid will, or even to transact any ordinary business. What Dr. Watson says, is this: “ No brain can be extensively diseased on both sides of the medium plane, without impairment of mind sufficient to be at once recognizable by the medical observer.”
Now, although it may be regarded as clear in this case, that the left hemisphere of the brain was seriously diseased, yet how far the right hemisphere was implicated, is, under the evidence, to say the least, doubtful. It certainly cannot be considered as incontrovertibly established, that the brain, to use the language of Dr. Watson, was “ extensively diseased on . both sides.” But even if it was, the only conclusion drawn from it by Dr. Watson himself is, that the impairment of mind would be such as to be recognizable by a medical observer. This clearly is not enough to render a man incapable of making a will. A man’s mind may be perceptibly weakened, and he still possess that degree of intelligence which the law requires in a testator. In any view, therefore, which can be taken of that portion of the medical opinions which assumes to deduce the state of the mind, from ■ the condition .of the brain, it cannot be considered as in any manner decisive of the question at issue.
There is another portion of the opinion of Dr. Watson which is of an entirely different character. He recites the testimony of the various witnesses, and comments at length upon it, with a view to its bearing, not upon the physical condition of the brain, but directly upon the question of intelligence. I will refer to his mode of dealing with one portion of the evidence, which seems to me of the greatest importance. Many of the witnesses speak of the countenance of Mr. Parish; of its changes of expression; of the play of his features, expressive of pleasure, or the reverse. Dr. Taylor says: “His face was as *118 expressive as usual; as it ever had been,” and, in answer to the question, how did he manifest the pleasure you have spoken of, he replied: “ There was an expression of pleasure beaming from his countenance, and he continued to nod his head approvingly.” Mr. Tileston says: “ His countenance changed from time to time, as he was pleased or displeased, on this, and all other interviews I had with him.” Mr. Bra-dish, upon being asked whether the expression of Mr. Parish’s face was of a uniform character, replied: “I should think not; from my present recollection it would vary, according to .the various occasions of the excitement or interest.” Mr. Webb says on this subject: “ His expression was as intelligent as I ever knew it to be, and as responsive to any remark I made.” These are merely examples of the manner in which the witnesses generally speak of the expression of face.
Dr. Watson, in reference to this portion of the testimony, uses this language: “I do not know that I ever witnessed an instance where the dementia supervened late in life, in which the patient’s faculties were so completely overwhelmed by the disease of the brain that he could not, while yet conscious and enjoying the sense of sight and hearing, respond, by look, or by the play of features, to the countenance, .if not to the words, of those who were addressing him. How, it is this reflection oj ourselves in the faces of other's with whom we come in contact, that is so apt to mislead us in our intercourse with the lunatic, the idiot and the imbecile.”
This can hardly be considered a satisfactory explanation of this vital point in the evidence. It supposes that the intelligent witnesses here named and many others of the same class, with every opportunity of observing, were unable to discriminate between the instinctive conformity to their own expression of face, the reflex image of their own countenances, and an intelligent play of features, obviously responsive to the thoughts suggested. This supposition is inadmissible. It cannot be true. They might be misled in a single interview; but that after a business and social intercourse of years they should still be deceived is utterly incredible.
*119 I deem, it unnecessary to determine the question of the burden of proof, that is, whether a testator of the requisite age is to be presumed to be compos mentis until the contrary appears or whether it is incumbent upon the proponent of the will, to give evidence in the first instance on this subject, whenever the fact is contested; because, in my view of the case, the evidence very greatly preponderates in favor of the position, that Mr. Parish, at- the time of the execution of each of the codicils, instead of being an utter imbecile, was possessed of considerable capacity and judgment, and more than the law requires to enable a testator to make a valid will. I do not suppose, however, that he retained all his original vigor of intellect; and the question remains, whether advantage was taken of his mental and physical weakness to Obtain by fraud, coercion or the .exercise of an improper influence, a will which he would not have made, if left to the spontaneous suggestions of his own mind.
This question, although not as clear in point of feet as that already considered, for the reason that the capacity of the testator is proved by affirmative evidence, while a conclusion that there was no fraud would depend mostly upon the absence of evidence, is nevertheless equally clear in law. Fraud and undue influence must be proved. They may no doubt be. inferred from circumstances; and the nature of the will may be taken into consideration in determining the point. But I see nothing in the fact, that the testator, by the codicils in question, gave the accumulations of his estate to his wife, rather than to his brothers, from which it would be safe to infer fraud. ¡Neither she nor they stood in need of it. She was very munificently provided for by the original will and the first codicil, and certainly could have had no apology for making any undue efforts to increase the provision. There may be reason to suspect that she desired to obtain the whole estate, and that she entertained some .jealousy of Daniel Parish, and of his influence with his brother, and some dislike towards him and his family. But this, although proof of some human weakness, would not be enough to invalidate the codicils, and *120 this, as it seems to me, is the utmost that can be claimed upon this point. There is no proof that she misrepresented Daniel Parish to his brother, or that she practised any fraud or artifice to create a prejudice in the mind of the latter against him; and without this, her jealousy and dislike of Daniel Parish, although it may seem to raise a suspicion, amounts to nothing more. Mrs. Parish’s assiduous and constant attendance upon her husband cannot be permitted to weigh against her. If it could, it would never in such cases be safe to act in accordance with the promptings of affection, and a high sense of duty.
There is considerable direct evidence in the case, to show that Mr. Parish was not'under his wife’s control. I will men tion only what occurred upon the execution of the second codicil, in relation to the charitable gifts. It having been ascertained, or at least assumed, that Mr. Parish was anxious to give about the sum of fifty thousand dollars to charitable objects, the question arose as to what particular charities should be made the recipients of his bounty. Mrs. Parish’s ■brother Edward, was at the head of, and deeply interested in the prosperity of the Mew York Eye and Ear Infirmary, and she proposed that the whole sum should be given to that institution ; but Mr. Parish at once refused, and persisted in this refusal to the last; finally consenting, after selecting several • other objects, to give the sum of twenty thousand dollars in stead of fifty, to the Eye and Ear Infirmary. This, unless Mr. Lord was practised upon to a degree that, in respect to a man of his intelligence, is almost inconceivable, affords very strong evidence that Mr. Parish in making those codicils, exercised an independent will. Upon the whole case I think it quite impossible to hold, that fraud or undue influence operating upon the mind of Mr. Parish is established by the proof. The counsel for the respondents, James and Daniel Parish, himself rejects the idea. He argues with great earnestness, that the affection of Mr. Parish for his wife was not increased after his attack in 1849, and to prove this, refers to his irritation in consequence of the dietetic restraint which she imposed or urged upon him, and to the testimony of Dr. De *121 lafield on the subject, and then adds: “ This same witness, Dr. Delafield, makes a remark quite in harmony with the facts just stated, and our views of the whole evidence. He says, that she had very little influence over him before the attack, and less afterwards.” After this explicit concession by the counsel, the question of undue influence may be considered as virtually out of the case. The position upon which the able and eminent counsel relies is, that the testator was idiotic, substantially without mind or intelligence, and that his acts were dictated and all his movements prompted by his wife; and the fraud and deception imputed to her is charged as operating, not upon him, but upon the numerous intelligent witnesses who have testified to their belief in her husband’s capacity. I have already stated my reasons for thinking this position untenable. It follows that, upon the evidence before the surrogate, the codicils should have been held valid and admitted to probate.
Sutherland, J., concurred in this opinion.
Judgment affirmed.
Note. — The Chief Judge, Samuel L. Selden, who had been kept from attendance at this and the preceding terms of 1862, by the illness and death of his wife, resigned at the close of June term, and Henry R Selden was appointed in his place. Judge Henry E. Selden took no part in the decisions at September term, except when the fact is specially noted. Judge Allen was in attendance during only a part of June term. Judge Denio was detained at home "by illness during the whole of September term, and the consultation preceding it. Judge Wright had been absent, from the same cause, from the consultations preceding the March and June terms. From this unfortunate concurrence of circumstances, the consultations preceding the several argument terms of 1862 were attended by only six judges, who took part in the decisions. It was only at December term that the court was full, and then Oh. J. Denio was under the disadvantage of having heard none of the arguments at September term. The December term, it is proper to state for the information of the Profession outside of this State, is devoted exclusively to consultation, and the decision of cases heard at the preceding term, and such as have been held under advisement during the year. Reporter.
*123 CASES AEG-UED AND DETEEMINED IN THE COURT OF APPEALS OF THE STATE YORK, September Term, 1863.